**NATIONAL BANK OF WASHINGTON,**
**a Corporation, Appellant,**

v.

**Sally DIXON, Appellee**
**No. 16285.**

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 5, 1961.

Decided Nov. 30, 1961.

Petition for Rehearing En Banc Denied
En Banc Jan. 11, 1962.

Chief Judge Miller and Circuit Judges Bastian and Burger would grant the petition for rehearing en banc.

---

———◇———

Mr. Cornelius H. Doherty, Washington, D. C., with whom Mr. Cornelius H. Doherty, J., Washington, D. C., was on the brief, for appellant.

Mr. Martin E. Gerel, Washington, D. C., with whom Mr. Lee C. Ashcraft, Washington, D. C., was on the brief, for appellee.

Before WILBUR K. MILLER, Chief Judge, and PRETTYMAN and WASHINGTON, Circuit Judges.

PRETTYMAN, Circuit Judge.

Appellant National Bank of Washington was the owner, as trustee under a will, of a tenement property. At the time the Bank became trustee, a lease was on the property, executed by Floyd E. Davis Company, as lessor, to one William Marcum.[1] Marcum leased a furnished room in the basement to appellee Dixon and her husband. The floor of the room was wooden, covered with linoleum which was "nailed down on the edges." On May 11, 1959, Mrs. Dixon stepped upon a chair to get a coat hanger. The leg of the chair went through the linoleum and entered a wide crack in the floor beneath, causing the chair to tilt. She fell and broke her arm. Mr. and Mrs. Dixon filed suit against the Bank for negligence. The theory of the case was that her injuries were the direct and proximate result of the negligence of the Bank, as the owner of the premises, through its failure to maintain the premises in a reasonably safe condition, the failure being in violation of the Housing Regulations of the District of Columbia. A jury returned a verdict in favor of Mrs. Dixon.[2]

The pertinent provisions of the Housing Regulations are:

"Every premises accommodating one or more habitations shall be maintained and kept in repair so as to provide decent living accommodations for the occupants. This part of this Code contemplates more than mere basic repairs and maintenance to keep out the elements; its purpose is to include repairs and maintenance designed to make a prem-

1. It appears that Floyd E. Davis Company was a real estate firm which had managed the property for a former owner and continued to do so for the Bank after it acquired title. It further appears that the Davis firm had no lease from anyone, or any proprietary interest in the property. It could, according to the

Bank's counsel, have been replaced by another agent at any time, or the Bank itself could have assumed active management.

2. The jury returned a verdict for the defendant Bank against Mr. Dixon.

ises or neighborhood healthy and safe." [3]

"Each floor shall be structurally sound, reasonably level, and free of holes and wide cracks. Each floor shall be free of loose, splintered, protruding, or rotting floor boards." [4]

"No owner, licensee, or tenant shall occupy or permit the occupancy of any habitation in violation of these regulations." [5]

The Regulations were validly adopted under statutory authority.[6] The Bank was the owner of the habitation. The floor was not free of holes, wide cracks, or rotting floor boards. The trial court submitted to the jury not only the question as to the negligence of the owner but the question of contributory negligence on the part of Mrs. Dixon.

■■ The Bank contends that it had no notice, actual or constructive, of the defective condition of the floor in the leased premises. However, the Bank had been the owner, as trustee, for two years and seven months prior to the accident. Mr. Dixon testified that in the fall of 1958 he called Marcum's attention to "several spots" in the floor; and that he believed termites had to be under the floor. After the accident, with Marcum's permission, he tore off a piece of the linoleum "[t]o keep anybody from making the same mistake [Mrs. Dixon] made, so they could see it. There was a hole in the floor and the floor was rotten." The lessee, Mr. Marcum, testified that he had no license for the premises as a rooming house or tenement until 1960; and, asked why no license was issued, he responded, "I had to have running water in each room, and the hallway to the basement, I had to take the old floor up and put concrete through the hallway." He testified that the hallway was made of the same type of wood as was the room occupied by the Dixons. He further testified that he did not know of anybody from the Bank ever going down to look over the property. No evidence contrary to the latter statement was presented. In Whetzel we said: " * * * it is enough if, in the exercise of reasonable care, appellee should have known that the condition of the ceiling violated the standards of the Housing Code." [7] We think that here there was enough evidence on this score to take the case to the jury. The owner of a habitation subject to the Housing Regulations should not be able to shield himself from liability for violation of the Regulations by failing to inspect the property or to ascertain its condition during a period of time such as is here involved.

We find no reversible error.

Affirmed.

WILBUR K. MILLER, Chief Judge (dissenting).

A fuller statement of the facts will be conducive, I think, to an understanding of the reasons for this dissent. On March 1, 1956, Floyd E. Davis Company leased to William Marcum the premises located at 210 F Street, N.W. The lease, which was prepared on a printed form, provided the building should be used for residential purposes, and should not be occupied by more than eleven persons in addition to the two members of the lessee's immediate family. The lessor was not obligated to make repairs, alterations or improvements, and the lessee expressly waived the right to demand them. In addition, the following paragraph was typed in the body of the lease:

"It is further agreed that the lessee will make any and all repairs or improvements to the property resulting from notices served by the District of Columbia government covering violations of municipal reg-

---

3. Sec. 2501—General Maintenance and Repair.

4. Sec. 2505—Floors.

5. Sec. 2301—Use and Occupancy.

6. Whetzel v. Jess Fisher Management Co., 108 U.S.App.D.C. 385, 282 F.2d 943 (D. C.Cir.1960).

7. Id., 108 U.S.App.D.C. at 393, 282 F.2d at 951.

ulations from any of its agencies, at his own cost and expense. In the event of his failure so to do it is understood and agreed between the parties hereto that he will vacate before expiration of the time limit contained in such notice."

Floyd E. Davis Company was and is a real estate management firm. In leasing the property to Marcum, it was acting for an individual client who owned the premises but, in accordance with a practice often followed in the District of Columbia, the Davis Company executed the lease as lessor without indicating it was not the owner. The appellant, The National Bank of Washington, as trustee under a will, acquired legal title to the property October 9, 1956, and held it until December 21, 1959. It took title subject to the lease theretofore executed with William Marcum, who continued to be the lessee at all times mentioned herein. Floyd E. Davis Company was retained in its original rental management capacity.

In July, 1958, William Marcum rented a furnished room in the leased premises to Marvin G. Dixon. The latter and his wife, Sally, occupied it until some time in July, 1959. Dixon recognized Marcum as his landlord and paid the rent to him. On May 12, 1959, Mrs. Dixon fell from the chair on which she was standing in the rented room, because the chair tilted when one of its legs penetrated the linoleum and went into a hole or wide crack in the floor beneath it. She sustained a broken arm.

Mrs. Dixon and her husband filed suit September 23, 1959, against The National Bank of Washington, *not as trustee but in its private corporate capacity*, seeking damages in the total sum of $33,001. They did not sue Marcum or Floyd E. Davis Company, but did join as defendant the ABC Cleaning Contractors, Inc., as "the party *additionally* responsible for its [the building's] maintenance." (My emphasis.) The ABC company is not involved in this appeal, and I mention it only because the word "additionally" shows the plaintiffs' theory that the bank was responsible for the maintenance of the premises. They alleged her injury was the direct and proximate result of the bank's and ABC's negligence in failing "to maintain the premises in a reasonably safe condition although having had actual or constructive notice of the defects and having had sufficient and reasonable opportunity to repair same." They further alleged "the defendants violated Sections 2501 and 2505 of The Housing Regulations of the District of Columbia, established and authorized for promulgation by Commissioners' Order dated August 11, 1955." The day after the suit was filed, viz., September 24, 1959, the plaintiffs dismissed as to the ABC company, and the case proceeded with the bank as sole defendant. The bank denied any negligence or the violation of any housing regulation of the District of Columbia, and denied there was any obligation on its part to make any repairs to the premises. It charged Mrs. Dixon with contributory negligence.

At the trial, the lease from Floyd E. Davis Company to Marcum was placed in evidence, the fact that the bank as trustee thereafter became holder of the legal title was made to appear, and the fact that Marcum rented a furnished room to the Dixons was shown. Testimony was adduced as to the accident and the nature and extent of Mrs. Dixon's injury. No evidence was offered to show the bank had knowledge or actual notice that there was a hole or wide crack in the floor beneath the tacked-down linoleum. Constructive notice could not be imputed to it—in my opinion—from the mere fact the bank as trustee had held legal title for some time before the accident. Nothing else was shown.

In his charge to the jury, after stating "The burden is upon the plaintiffs to prove by a preponderance of the evidence that the defendant was negligent and that such negligence was the proximate cause of the injury to the plaintiffs," and after giving the usual preliminary instructions, the trial judge said:

"Now getting down to this case and the basis upon which the plain-

tiffs allege negligence, there has been received in evidence and there was read to you Sections 2301, 2501 and 2505 of the housing regulations of the District of Columbia, which were in full force and effect on May 12, 1959. I want to read them to you at this time.

"Section 2301 reads:

" 'No owner, licensee, or tenant shall occupy or permit the occupancy of any habitation in violation of these regulations.'

"Section 2501 reads:

" 'Every building housing one or more habitations shall be maintained and kept in repair so as to provide decent living accommodations for the occupants. This part of this code contemplates more than mere basic repairs and maintenance to keep out the elements. Its purpose is to include repairs and maintenance designed to make building [sic] or neighborhood healthy and safe.'

"Section 2505 dealing with floors specifies:

" 'Each floor shall be structurally sound, reasonably level, and free of holes and wide cracks. Each floor shall be free of loose, splintered, protruding, or rotting floor boards.'

"Your first consideration with regard to these regulations will be whether or not they were violated by the defendant. If you find that the plaintiffs have established by a preponderance of the evidence that these regulations were violated by the defendant, you will proceed to consider whether such violation constituted negligence under these instructions and whether such negligence was the proximate cause of the injuries sustained by the female plaintiff."

Thus the trial court told the jury that Sections 2501 and 2505 of the Housing Regulations required the bank to maintain the premises as specified therein, and submitted to it the question whether the bank had violated those sections; and,

if so, whether such violation was negligence which proximately caused the injury. But the bank had conceded it had not maintained the premises in the manner required by the Regulations, or at all; and it did not deny that a hole or wide crack in the floor had caused the accident; so there was no issue as to those two propositions for the jury to consider.

Instead, the bank's contention was that Sections 2501 and 2505 did not apply to it; that it was under no duty thereunder, or otherwise, to keep the floor free of holes and wide cracks. The court's submission of the question whether the bank had violated these sections amounted to a decision that the sections applied to it and required it to maintain the floor free of holes and wide cracks. Thus the charge ignored the defendant's legal contention and, in the circumstances, was tantamount to a direction to find against the bank.

With a charge which gave such an easy opportunity, it is not surprising the jurors returned a verdict awarding Mrs. Dixon $5,500 for a broken arm, although they had been warned by the court to avoid being swayed or influenced by the fact that the plaintiffs were individuals and the defendant was, as the judge put it, "a large banking corporation." Although it awarded damages to Mrs. Dixon, the jury found for the bank on Dixon's claim for loss of consortium. He did not appeal.

I turn to consider whether, in the circumstances shown, Sections 2501 and 2505 applied to the bank and required it to keep the floor free of holes and wide cracks. For, if the sections did not apply to the bank, and if it was not otherwise chargeable with negligence in not repairing the floor, the court erred in permitting the jury to find it negligent.

These two sections do not say whose duty it shall be to comply with their requirements, and no other section of Article 250 on the general subject of "Maintenance and Repair," in which Sections 2501 and 2505 appear, contains any sug-

512

gestion on the subject. It seems reasonable to suppose, however, that the Commissioners intended to place responsibility for the maintenance and repair required by the Article upon him who, in the circumstances of each case, is subject to the general duty to maintain and repair—either the owner or the lessor's licensee who was the general tenant of the entire building.

That such was the intention of the District Commissioners is indicated in other Articles of the Regulations which do name the person who must obey their instructions. I think the indication thus given should be considered in determining where the Commissioners intended to place the duty of complying with Sections 2501 and 2505, despite the fact that Section 2105 declares that "Each section and every part of each section of these regulations is hereby declared independent of every other section or part hereof * * *."

For example, Section 2401, the first section of Article 240, entitled "Facilities, Utilities and Services," begins as follows:

"The owner or licensee of each residential building shall provide and maintain the facilities, utilities and services required by this part.[1] * * *"

I suggest this provision was intended to govern with respect to the succeeding Article on "Maintenance and Repairs," or that a similar sentence was omitted from the latter Article through oversight. It is hardly probable the Commissioners intended to adopt Sections 2501 and 2505

without requiring somebody to obey them.

Section 2301 also indicates the person who is required to obey Sections 2501 and 2505. I have already quoted a portion of the judge's charge which contains Section 2301, but I repeat it here for convenient reference:

"No owner, licensee or tenant shall occupy or permit the occupancy of any habitation in violation of these regulations."

With respect to this section, the jury was directed to determine (a) whether the bank (the owner) had negligently violated it, and (b) whether Mrs. Dixon (the tenant) had violated it and so been contributorily negligent.[2]

It was shown without dispute that the bank did not *permit* Mrs. Dixon to occupy the room except in the sense it did not *prevent* or *forbid* her occupancy; that it was Marcum, the licensee, who *permitted* her to "occupy the habitation." It was also undisputed that Mrs. Dixon did occupy the room. Paradoxically, however, the jury found the bank had violated Section 2301 but that Mrs. Dixon had not. So, the jury must have concluded the bank had constructive notice of the hole in the floor because it had owned the building for more than two years, but that Mrs. Dixon did not have such constructive notice even though she had lived in the room for ten months. Thus the jury seems to have charged the bank with, and exempted Mrs. Dixon from, the duty of inspecting the floor beneath the linoleum to learn whether there were latent defects; and this, despite the court's admonition that "The

1. Does the word "part" mean "Article" or "Chapter"? (The Regulations are divided into Chapters, the Chapters into Articles, and the Articles into Sections.) If "part" means "Article," Section 2401 applies directly only to Article 240, of which it is a part, and applies only indirectly to the succeeding Chapter 250, denominated "Maintenance and Repairs," which includes Sections 2501 and 2505. But if the word "part" means "Chapter," Section 2401 has direct application to those two sections because they are in

the same Chapter. In either event, I think Section 2401 fixes the responsibility for complying with Sections 2501 and 2505, either by direct application because the three sections are a part of the same Chapter, or by implied application because the Article containing Sections 2501 and 2505 does not by its own terms fix responsibility for compliance with it.

2. The court's charge did not mention the licensee, Marcum, in connection with Section 2301, as he was not a defendant.

plaintiffs and the defendant are entitled to equal justice under the law."

I think the correct interpretation of Section 2301 is that the words "owner" and "licensee" are used in the alternative just as in Section 2401; so that, with respect to *permitting* occupancy, the section means "The owner or licensee shall not permit the occupancy * * *," and therefore addresses itself to the one of the two who has dominion and control over the particular occupancy involved. Again I point out it was Marcum, and not the bank, who permitted Mrs. Dixon to occupy the room.

There is no provision, indication or suggestion that the Commissioners' purpose was to require the owner of a multiple unit dwelling to provide the specified maintenance when he had contractually given dominion and control of the premises to another, who had obligated himself to make the repairs and improvements required by municipal authority. Hence, cases cited by appellant from states which have gone so far as to require statutorily that landlords make repairs, have no application here.

Thus, the object of Sections 2501 and 2505 was not arbitrarily to impose the duty of maintenance upon either the owner or the licensee, but to require that he who had the general legal duty of maintenance must perform it in a particular fashion.

The initial question in this case was, therefore, upon whom was the duty of specified maintenance: upon the owner or the licensee? upon the bank or upon William Marcum? That question suggests a preliminary inquiry: was Marcum a licensee within the meaning of the Housing Regulations? As to that, I note first that the Regulations contain a lengthy list of definitions of words and terms employed, but do not define the word "licensee." And Section 1101.1 provides that "Words shall have their usual meaning unless the context clearly indicates a different meaning." From this I conclude the word "licensee" is used in the sense and with the significance it ordinarily has; that it has no special, restricted or technical meaning. It is, therefore, not a mere description of one to whom an occupational license has been issued, but has the more general meaning of one to whom any license or privilege has been given.

Actually, however, William Marcum was a licensee of the District of Columbia at and before the time of the accident, although he did not receive until 1960 the formal occupational license to operate a tenement house for which he had applied.[3] On August 26, 1958, the Superintendent of Permits of the District's Department of Licenses and Inspection issued to him the following certificate, which was still in effect at the time of Mrs. Dixon's mishap:

"Certificate of Occupancy
No. B 13124
"Washington, D. C., August 26, 1958
"Permission is hereby granted to WILLIAM MARCUM to use the ALL & BASE. floor(s) of the building located on Lot 34 Square 568 known as premises 210 F St., N.W. for the following purpose(s): TENEMENT HOUSE.
"Zone SP Fee $10.00
"Superintendent of Permits
"By T. W. HESTER, Permit Clerk."

Also on the face of the Certificate appears the following statement:

"This Certificate Shall Be Posted Conspicuously on the Above Premises at All Times. It Is Valid Indefinitely, unless an expiration date is stated, Only for the premises, or part thereof, and for the purpose(s), indicated above, and Is Not Transferable to another person or premises under Any conditions. Any

---

3. Marcum's application of November 3, 1958, for a rooming house occupational license was rejected because inspection showed the building to be a tenement house instead of a rooming house. The application was corrected and an occupational license to operate a tenement house was issued for 1960.

Change in the type of business, ownership of business, or part of premises used therefor, will render this Certificate Void and a New Certificate must be obtained.

"Dept. of Licenses & Inspections, "Gov't. of Dist. of Col."

Moreover, Marcum was a licensee of Floyd E. Davis Company, and through it of the owner, by virtue of the lease which gave him dominion and control over the entire building and in which he undertook to make repairs, including those required by governmental authority. The record shows Marcum had actually made some repairs in the building.

From what has been said, it seems clear from his contract and conduct that Marcum was the person who had complete charge of the premises and complete responsibility for maintenance. There was no contrariety of proof on this score and so there was no issue concerning it to be submitted to the jury. It was to him, then, and not to the bank, that Sections 2501 and 2505 of the Housing Regulations spoke. They told him the kind of maintenance he must provide in meeting his obligation to make repairs.

In these unchallenged circumstances, it was error to permit the jury to say whether the bank had violated these sections by not maintaining the premises as required thereby, for indubitably it was Marcum, and not the bank, who was required by regulation to keep the Dixon floor free of holes and wide cracks and had not done so. A verdict for the bank should have been directed.

The majority opinion affirms the judgment, erroneously I think, because it overlooks the considerations I have suggested and assumes, as did the District Court, that the Housing Regulations cast on the bank the burden of maintaining the premises in the prescribed manner. My brothers cite the Whetzel opinion,[4] from which I dissented and which I think should be reconsidered by the full court. But the majority opinion here goes far beyond the Whetzel case. There the tenant sued the management company which was not only the lessor, like Floyd E. Davis Company, but was also the immediate landlord of the occupants, as was Marcum—unquestionably charged by the Housing Regulations with the duty of the prescribed maintenance. But, as I have said, the Dixons did not sue Marcum, the licensee, nor Floyd E. Davis Company, Marcum's lessor. They chose to make the bank the sole defendant and, in doing so, sued the wrong party.

For these reasons, I think the judgment appealed from should be reversed with instructions to enter judgment for the defendant. My view is that negligence must be shown before liability can arise. The mere fact of injury is not enough.

4. Whetzel v. Jess Fisher Management Co., 108 U.S.App.D.C. 385, 282 F.2d 943 (1960).